THE STATE OF TEXAS V. FARMERS' LOAN AND TRUST
COMPANY ET AL.

No. 7976.

1. **Nonsuit—Discontinuance.**—Where the plaintiffs dismissed their suit after an intervention had been filed, such dismissal would not affect the legal rights of the intervenor, whether the action of the plaintiffs and of the court be technically a nonsuit or a discontinuance.

2. **Intervention—Rights of Intervenor.**—If a petition in intervention shows such interest in the subject matter of the litigation between the parties as would entitle the intervenor to maintain an independent action against the plaintiffs or those represented by them, and to have the relief in whole or in part sought, then the intervention would not be affected by a dismissal by the plaintiffs of their action.

3. **Same.**—If no such independent cause of action be shown in the intervention, then no error would exist in the dismissal of the intervention upon the dismissal by the plaintiffs.

4. **Right of Action by State—Constitution.**—Where a right of action in behalf of the State is defined in the Constitution, such right should be recognized by the courts independently of the presence or absence of any pecuniary interest in the public in the subject of the litigation.

5. **Attorney-General — Corporations — Constitution.** — The Constitution provides that the Attorney-General "shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party, and shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power, or demanding or collecting any species of taxes, tolls, freights, or wharfage, not authorized by law. He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law; and give legal advice in writing to the Governor and other executive officers when requested by them; and perform such other duties as may be required by law." Art. 4, sec. 22. This section confers powers on the Attorney-General, and it also imposes duties which must be performed whenever facts arise which call for their performance; but it does not determine what facts, in a given case, will authorize him to bring and maintain an action in behalf of the State, except by this general enumeration of cases in which it is made his duty to bring and maintain suits.

6. **Right of Attorney-General to Sue.** — To entitle any person or corporation to maintain an action it must be shown that the one suing has an interest in the subject matter of litigation, either in his own right or in a representative capacity, and a State is not exempt from this rule; though it might be conceded that such representative character could be established by a positive law when the relation could not be held to exist in absence of such legislation. In view of this rule it is held that an action or suit can be maintained by an Attorney-General in behalf of the State for the redress of an injury to the public, or to prevent this, and that he can not maintain a suit or action when private rights alone are involved.

7. **Railroad Bonds.** — In the suit by appellees to foreclose bonds of the International & Great Northern Railway Company, the Attorney-General, in behalf of the State, intervened, and alleged that the State made a large donation of lands to the defendant company, exceeding with exemptions given the entire value of all the property of the railway company, "for the purpose and on the conditions that said railway company would have and maintain low charges upon the traffic of the country, and that by the obligations of said company it is bound to maintain low freight and passenger rates,

which it can not do should the relief prayed for in the plaintiff's petition be granted [the foreclosure of the bonds and sale of the property].   *   *   *   That if the decree prayed for by the plaintiffs be granted, the said railway company will be forced to increase the rates on traffic over its lines, and thereby impose extra and onerous burdens upon the commerce of the country in order to raise sufficient revenue to pay said fictitious indebtedness, or to meet the interest thereon; that if the relief prayed for herein shall be granted, then the rates will be materially decreased, and the public in that way greatly benefited." Treating the bonds sought to be foreclosed as fictitious, *held:*

1.   A sale of the property under the decree of foreclosure asked by the plaintiffs in passing title to the road and franchise would satisfy as to the property the mortgage debts and all other debts of the railway company except prior liens, and would deprive the company of any power over the rates of the road when operated by the purchaser under the foreclosure.   The question as to what the railway company would do or would not do is immaterial.

2.   The International & Great Northern Railway Company is subject to control as to its rates by legislation, and it has been so controlled by the general laws fixing maximum rates.   Special Laws 1866, p. 179; Special Laws 1870, p. 110; Const., art. 10, sec. 2; Sayles' Civ. Stats., arts. 4257, 4258b.

3.   There is no reason to believe that in fixing the maximum rates the Legislature took into consideration the indebtedness of any company; but if this were otherwise, as the power to fix maximum rates was conferred by the Constitution upon the Legislature, relief in that respect should come through that department and not through an appeal to the courts.

4.   It would not be contended that the court could legally have made and enforced an order that the railway company, after the cancellation of the bonds alleged to be invalid, should transport freight or passengers at rates lower than the maximum fixed by law.

5.   Courts can not give equitable or other relief to the State as the representative of public interests upon the sole ground that this may place a railway company in a position in which without injury to itself or creditors it might serve the public at a lower rate with profit to itself than it could if such relief was not granted, when under positive legislation no legal obligation would rest upon the corporation to make the burden upon the public less than the law expressly authorizes.

6.   To maintain such an action under the general rules governing equitable procedure it must be made to appear that the public interest will be subserved through the direct effect of the decree itself, and it is not enough that the decree would show the ability of the railway company to serve the public with profit to itself under a rate lower than the maximum fixed by law.

7.   Averments as to what would be the effect of the failure of the court to cancel the bonds in question, or of its act canceling them, upon the cost of transportation and consequently on public interests, are not such as to entitle the State to maintain its intervention, for they are but conclusions drawn from facts which do not justify them.

8.   There is no contract evidenced by the charter, etc., of the International & Great Northern Railway Company, that it is to be controlled by any other rules than those prescribed by the general laws controlling rates.

8.   **Constitutional Authority of Attorney-General.**—It is not believed that it was the purpose of section 22 of article 4 of the Constitution to confer on the Attorney-General the power to institute equitable proceedings such as this in every case in which a private corporation may exercise a power not conferred by law, without reference to the question whether such exercise of power is hurtful to some interest essentially public, nor to prevent the exercise of a power not conferred by law, on such corporations except in cases in which it is made to appear that the exercise of the power will be hurtful to some interest essentially public.

9. **Same.**—The right of the Attorney-General in behalf of the State through the courts to prevent any private corporation from exercising any power not conferred by law when this is hurtful to the public, or the assumption of a franchise which in itself is a public wrong, can not be questioned, and would exist from the nature of the office in the absence of a constitutional provision expressly conferring it.

10. **Violation by Corporation of Duty to Stockholders, etc.**—If bonds were issued without authority of law and the directory of such corporation fail to resist payment of such bonds, such acts would be in violation of duty to the stockholders and creditors of the corporation; but the failure to resist the enforcement of such bonds would not be the exercise of a power not conferred by law, but the failure to exercise a proper and necessary power; which would not present a case within the letter or spirit of the Constitution entitling the State to a preventive remedy as against the bondholders, mortgagees, or trustees, unless it was shown that the public had an interest in the nonpayment of the bonds through foreclosure or otherwise.

11. **Railway Bonds Illegally Issued.** — It was alleged in behalf of the State that the bonds, etc., sued upon were not issued by the railway company, by its directors, or by any person authorized to represent the company. If so, it follows that the railway company in this respect performed no act unauthorized by law in the issuance of the bonds and the execution of the mortgage giving the State a cause of action.

12. **Decree Rendered on Appeal.**—The demurrer to the petition in intervention having been overruled by the trial court, and it being here held insufficient, and judgment below having been rendered against the State on other grounds, the judgment is affirmed, but without prejudice to the rights of the State hereafter to institute such legal proceedings as may be deemed proper.

APPEAL from Smith.    Tried below before Hon. Felix J. McCord.

This was a suit instituted in the District Court of Smith County, Texas, March 30, 1889, by the Farmers' Loan and Trust Company as plaintiff against the International & Great Northern Railway Company as defendant, to recover the sum of $10,348,000 due upon certain second mortgage bonds, alleged to have been issued and sold by said railway company and applied to the construction and operation of its road, and to foreclose a certain second mortgage upon all the property and franchises of said company, alleged to have been executed by said company to plaintiff as trustee to secure the payment of said bonds.

There was a prayer for the appointment of a receiver, and receivers were appointed to take charge of and operate the mortgaged property, under the direction of the court, during the pendency of the case; prayer for judgment for amount sued for, and for foreclosure of mortgage and sale of the property to satisfy such judgment; for costs of suit, and for general and special relief.

The defendant company, on September 20, 1889, answered by general demurrer and general denial.

On September 6, 1889, the State of Texas by order of the court was permitted to intervene in said suit.

Admitted as a party to the action, the State, by its plea of intervention, challenged the validity of the mortgage and bonds sued on, for various reasons; prayed that each be canceled; that the owners and

·holders be prohibited from negotiating them; that the corporation and its receivers be restrained from paying them; and for general and special relief.

On September 18, 1889, plaintiff filed exceptions to the State's plea of intervention, and moved to strike it out.

On February 28, 1890, the court, upon a hearing of plaintiff's exceptions and motion to strike out the State's plea of intervention, overruled the same and permitted the State to remain à party to the action. The case was thereupon continued to the Fall term, 1890.

On October 6, 1890, the case being called for trial, plaintiff moved the court to take a nonsuit, which was by the court permitted, adjudging the plaintiff to pay all costs of the proceeding and all other parties to go hence without day; to all of which the State in open court then and there objected and protested, and asked to be heard on its plea of intervention, which being refused the State excepted and in open court gave notice of appeal to the Supreme Court of Texas, filed its bill of exceptions and assignment of errors, and now brings the case to this court for revision.

[This statement is given by appellant, and is sufficiently full.]

*James S. Hogg*, Attorney-General, and *R. H. Harrison*, Assistant Attorney-General, for the State.—1. No plaintiff can take a nonsuit to the prejudice of the right of an adverse party of record to be heard on his claim for affirmative relief.

Nonsuit, when taken: "At any time before the jury have retired a plaintiff may take a nonsuit, but shall not thereby prejudice the right of an adverse party to be heard on his claim for affirmative relief." Rev. Stats., art. 1301. "The right of plaintiffs in general to take a nonsuit is unquestionable, but an application to this effect comes too late after the defendant has pleaded in reconvention." Thomas v. Hill, 3 Texas, 270; Egerty v. Power, 5 Texas, 501;·7 Texas, 55; 9 Texas, 363; 21 Texas, 184; 49 Texas, 703; 58 Texas, 96.

No doubt the State was an adverse party in this case, admitted by the court on its plea of intervention, wherein it sought affirmative relief by cross-demand on the plaintiff. The court's action in permitting the nonsuit prejudiced its right to have the issue made by its plea for that relief then and there settled, for it was denied a trial altogether. For these reasons the express provisions of the statute have been violated. Without inquiring further the case ought to be reversed.

The appellee, however, by an assignment of error, seeks here to challenge the right of the State in this action to question the validity of the bonds sued on. While its right to assign error in this case after taking a nonsuit may be questioned, the State has no disposition to avoid the issue; hence it joins and requests the court to pass on all the questions involved in the case—especially the one which will settle its

authority to make itself a party to such foreclosure proceedings for the purpose of having the fictitious bonds canceled or the corporations restrained from paying them, and the burden upon commerce sought to be established thereby averted.

2.   The court did not err in overruling plaintiff's exceptions to the State's plea of intervention and the motion to strike it out, for the reason that the plea stated a good cause of action in behalf of the State, and that it has such an interest in the controversy involved in this suit as entitles it to be made a party hereto.

Defense:   "The Governor  *  *  *  is authorized to order through the proper officials the  *  *  *  defense of any civil action  *  *  * whenever he deems such course proper for the assertion or defense of any right of the State."   Gen. Laws 1887, p. 138.

Against corporations:   The Attorney-General "shall represent the State in all suits, pleas, etc., and shall especially inquire into the charter rights of all private corporations, and from time to time in the name of the State take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power  *  *  *  not authorized by law."   Const., art. 4, sec. 22; Rev. Stats., art. 2806.

Stocks and bonds:   "No corporation shall issue stock or bonds except for money paid, labor done, or property actually received; and all fictitious increase of stock or indebtedness shall be void."   Const., art. 12, sec. 6; Rev. Stats., art. 4155.   No stock or bonds can be issued except for money, labor, or property actually received and applied to the purpose for which the corporation was organized.   Rev. Stats., art. 4154.   An issue of stock as paid up for cash at less than its par value is void.   Spring Co. v. Knowlton, 103 U. S., 49; 14 Blatchf., 364; 57 N. Y., 518.   So where it has been issued at a great overvaluation for property.   Douglass v. Ireland, 73 N. Y., 100; Boynton v. Andrews, 63 N. Y., 93; Osgood v. King, 42 Iowa, 478.

Powers:   "All corporate powers of every railway corporation shall be vested in and exercised by its legally constituted board of directors." Rev. Stats., art. 4130.   "A corporation can not by by-laws, resolutions, or contracts enlarge or abridge the power given to the stockholders by the statutes of the State."   Brewster v. Hartley, 37 Cal., 15; 13 Minn., 59.   Powers will be construed strictly, and not implied in favor of the corporation.   Railway v. Collins, 40 Ga., 582.   And contracts made in violation of them are void. Railway v. Railway, 3 Am. Corp. Cases, 579.   When a bill is given for a consideration which by statute expressly makes it void, it is as against the party who gave it void in the hands of all parties, immediate or remote.   122 Mass., 71; 84 Ill., 292.

How elected:   "The board of directors shall be elected by the stockholders of the corporation at their regular annual meeting in each year."   Rev. Stats., art. 4125.

Funds: "Corporate funds can only be used for corporate purposes." Rev. Stats., art. 4141.

Right to borrow money, issue bonds, etc.: "Such corporation shall have the right from time to time to borrow such sums of money as may be necessary for constructing, completing, improving, or operating its railway, and to issue and dispose of its bonds for the payment of any amount so borrowed, and to mortgage its corporate property and franchises to secure the payment of any debt contracted by such corporation for the purposes aforesaid." Rev. Stats., art. 4219. And a mortgage is invalid unless authorized by proper resolution after notice. Rev. Stats., arts. 4146, 4220. And that resolution is not valid unless duly recorded in office of Secretary of State. Rev. Stats., art. 4221.

Sale of railway: The railway, franchises, etc., may be sold for debts, and purchasers are subrogated to all the powers and rights of sold-out company. Rev. Stats., art. 4260. And they are bound to discharge all the corporate duties to the public. Railway v. Morris, 67 Texas, 692; 68 Texas, 49.

Directors—trustees: When the railway property and franchises are sold out the directors and managers of sold-out company are required to act as trustees for creditors in winding up the corporate affairs. Rev. Stats., art. 4264.

Contract—charter: "A charter is a contract between the government and the incorporators who accept it." Dartmouth College Case, 4 Wheat., 518. Statutes in force when charter is granted are in legal effect part thereof. Relfe v. Rundle, 103 U. S., 222; Railway v. Groos, 47 Texas, 429. Railway companies must act up to the end and design for which they were incorporated. The State v. Railway, 45 Wis., 597.

Injunction: Equity will enjoin any improper diversion of corporate funds. High on Injunc., secs. 1192, 1554; Illinois v. Cook, 29 Ill., 237. Where a railway company used its funds in the "coal trade," action by the Attorney-General to restrain it was sustained on the ground of public interests. Attorney-General v. Railway, 1 Drewry & Smale's Rep. (Eng.), 154. And so where one incorporated for passenger business ran its trains exclusively for transportation of coal. People v. Railway, 53 Cal., 694. For a violation of their duties the Attorney-General may proceed against railway companies either by quo warranto or injunction. Attorney-General v. Railway, 35 Wis., 432. And he did so to restrain several of them from excess or abuse of their franchises and violations of public laws to the public detriment. Id., 434. It is the right of the State at all time to keep the grantees of its franchises within the limits prescribed in the grant. Attorney-General v. Detroit, 12 Am. Law Reg., 149. Railways are public improvements. 59 Am. Dec., 759; 57 Mo., 183. They are agents for the public. Commonwealth v. Railway, 1 Am. Ry. Cases, 499. Taking tolls is a franchise, and the public have an interest in its use. Beeman v. Railway,

22 Am. Dec., 679.   And they are held and the functions thereof are exercised for the public benefit.   People v. Railway, 70 N. Y., 569; 77 N. C., 347.

State may sue:   The right of States to sue in their own courts when-ever their rights are invaded is an incident of sovereignty.   The State v. Delesdenier, 7 Texas, 76; The State v. Grant, 101 Minn., 39; Peo-ple v. St. Louis, 48 Am. Dec., 339.   And when no exception is made by statute her civil actions should be presented in the same manner and under the same forms of remedy as individual suitors.   The State v. Kroner, 2 Texas, 492; The State v. Battles, 3 Ohio St., 309.   Unless prohibited by statute it has the right to sue whenever its interests are involved.   The State v. Bradish, 34 Vt., 419–423.   Has the right to prevent illegal issue of bonds by county.   The State v. Curators, 57 Mo., 178; Id., 350.   And can enjoin abuse of corporation franchises, as for instance the unlawful payment of money by municipal corpora-tion.   Attorney-General v. Detroit, 12 Am. Law Reg., 149.   Where general rights are declared or remedies given by law, the State is in-cluded therein, though not named.   Commonwealth v. Railway, 1 Am. Ry. Cases, 483.   When a corporation is guilty of an ultra vires act, and such act is detrimental to the interests of the public, it is compe-tent for the Attorney-General to file an information for the purpose of enjoining or setting aside such act.   Cook on Stock, etc., sec. 37; Green's Brice's Ultra Vires, 3 ed., pp. 708, 709; 4 Bradw. (Ill.), 100; 77 Ill., 426.   The corporation can not.   Cook on Stock, etc., sec. 38; Scoville v. Thayer, 105 U. S., 143; 103 U. S., 49.   The issue of fictitiously paid up stock with a view to defrauding the public might constitute a mis-use of the corporate franchise, and subject the charter to forfeiture. Cook on Stock, etc., sec. 37.   A State caused the charter to be forfeited because the subscribers for stock were insolvent at the time of sub-scribing, thereby perpetrating a fraud upon the public.   Holman v. The State, 5 N. E. Rep. (Ind.), 1886; Jersey City Co. v. Dwight, 29 N. J. Eq., 242; Railway v. Casey, 26 Pa. St., 287–318.   The State is not bound by the negligence or laches of its officers.   People v. Bank, 35 Am. Dec., 634; United States v. Nesley, 130 U. S., 263.   The occasions upon which the courts will exercise jurisdiction in behalf of the people at the instance of the Attorney-General to restrain the doing of acts by private corporations are:  (1) when any corporation is doing acts detri-mental to the public welfare or hostile to public policy;  (2) where any corporation is going outside or otherwise misusing its powers;  (3) in case of nonuser of franchise;  (4) when public interests are endangered. Green's Brice's Ultra Vires, 706, 712.

*Willie, Mott & Ballinger*, for appellees.—1. (1) The plaintiffs asked a dismissal of the cause, and not to take a nonsuit.

(2)  The judgment is an appropriate one to be entered up in discontinuing a suit at the instance of the plaintiff.

(3)  Plaintiff may discontinue where there is no counter-claim set up by a defendant, though an intervenor may be seeking affirmative relief.

(4)  The State was neither a defendant in the cause nor urging a counter-claim against that set up by the plaintiffs.  Rev. Stats., arts. 645–650, 1260; Rules for Dist. Courts, No. 53; Brothers v. Mumsheimer, 60 Texas, 240; Burrill's Law Dic., verb Nonsuit; Proff. on Jury Trial, sec. 107; Beebee v. Griffing, 14 N. Y., 235–243; Turnpike Co. v. The People, 9 Barb., 161; Prouty v. Eaton, 41 Barb., 409; McKay v. Ins. Co., 21 N. Y., 191; Agate v. King, Abb. Prac., 159; Coursen v. Hamlin, 2 Duer, 513; Peabody v. Bloomer, 6 Id., 53; Mott v. Burnett, 2 E. D. Smith, 50; Mynderse v. Snook, 1 Lans., 488.

2.  Admitting that the record shows a nonsuit and not a discontinuance, the judgment was correct; the State not being an adverse party asking affirmative relief, the relief sought being such as the State was not entitled to obtain in this proceeding.

3.  The State has no right to intervene in a controversy between private parties when no public interests are involved.  The People v. O'Brien, 111 N. Y., 33; The People v. Ingersoll, 58 N. Y., 13; Matter of N. Y. Ry. Co., 70 N. Y., 339; The People v. Railway, 89 N. Y., 93; The People v. Railway, 57 N. Y., 167–171.

4.  The State had no right to intervene in this suit, because the affirmative relief sought by it was such as could not be granted at the instance of the State in a suit of this character.

5.  It had no right to intervene, for the facts alleged in the petition of intervention showed that the relief sought by the State could not be granted without the presence of parties other than those already in the cause.  Beach v. Mosgrove, 16 Fed. Rep., 305; Duncan v. Railway, 2 Wood, 542; Railway v. Fosdick, 106 U. S., 47–76; Lander v. Arno, 65 Me., 26; 10 Ohio, 300; 10 Cal., 396; Appeal of Railway, 15 Atlantic Rep., 459.

6.  The State's intervention, if proper in other respects, could not be heard without having the owners of the bonds secured by the mortgages sued on before the court, and as intervenor the State had no right to bring parties into the cause who were necessary only for the purposes of intervention.  Sayles & Bassett's Prac. and Plead., sec. 281, and authorities cited.

7.  The intervention showed no cause of action on the part of the State, because the bonds and mortgages were issued in accordance with authority given in its charter to the International & Great Northern Railway Company; and the limitation in the Constitution and the Revised Statutes relied on by the State to invalidate their bonds and mortgages are void for impairing the obligation of a contract and defining

the bondholders of property otherwise than by due course of the law of the land. Act of April 24, 1874; Morris v. The State, 62 Texas, 728; Const. 1876, sec. 7, art. 14; Dartmouth College Case, 4 Wheat., 518; Fletcher v. Peck, 6 Cranch, 87; Chicago v. Sheldon, 9 Wall., 50; Ins. Co. v. De Balt, 16 How., 416; Railway v. Dow, 19 Fed. Rep., 388; Newcastle v. Simpson, 21 Id., 533; Peoria v. Thompson, 103 Ill., 187.

The stockholders are the only parties who can object to the manner in which the bonds and mortgages were authorized, and the State has no interest in the question. Thomas v. Railway, 104 Ill., 462; Ins. Co. v. Railway, 41 Barb., 9; Jones on Ry. Securities, secs. 172, 190; Railway v. Gentry, 69 Texas, 625, 633; Beecher v. Railway, 45 Mich., 109; G. S. Co. v. Whitten, 69 N. Y., 333; Bank v. Averill, 96 N. Y., 473; Kent v. Mining Co., 78 N. Y., 159; Sheldon v. Eickmeyer, 90 N. Y., 607; Railway v. Dow, 19 Fed. Rep., 388; Water Co. v. De Kay, 36 N. J. Eq., 548.

*Turner, McClure & Rolston*, attorneys for second mortgage trustees, *Herbert B. Turner*, *E. B. Kruttschnitt*, and *T. G. Shearman*, of counsel, filed arguments for appellees

STAYTON, CHIEF JUSTICE.—On March 30, 1889, the Farmers' Loan and Trust Company brought this suit against the International & Great Northern Railway Company on second mortgage bonds for over $7,000,-000, claimed to have been executed by the company about June 15, 1881, and secured by mortgage, with power to sell, executed to the plaintiff as trustee.

The petition recognizes the existence of a prior mortgage executed to Kennedy and Sloan by the company to secure what are claimed to be first mortgage bonds issued by the company; and the prayer was that plaintiff be placed in possession of the mortgaged property, or that all property of the railway company be placed in possession of and under the management of a receiver or receivers to be appointed by the court; that this series of bonds, as well as other second mortgage bonds secured by second mortgage to Thorne, Phelps, and Barnes, as trustees, of date November 1, 1879, be established with the mortgages; that the court would decree that the sum due on these mortgages was as claimed in the petition; that all the property of the railway company of whatever character was subject to lien to satisfy the sum claimed to be due; that this be sold subject to the prior mortgage of Kennedy and Sloan, and that the proceeds of sale be applied to costs of this litigation, including fees to attorneys, compensation of plaintiff for its services as trustee, and the remainder on sums found to be due on bonds sued upon; and that for any balance due on the bonds judgment be entered against the railway company.

The State of Texas having been permitted to intervene in the cause, on grounds to be hereafter stated, the prayer of the plaintiff further was, in the event that the court found the bonds sued upon to be void, that the property covered by the mortgages given to secure them should by decree be restored to Kennedy and Sloan, to be held by them in trust for the holders of bonds, termed purchase money bonds, secured by the first and second mortgages, and that Kennedy and Sloan have their writ of possession.

Kennedy and Sloan were not made parties to this suit so far as the record shows.

The International & Great Northern Railway Company answered by a general demurrer and a general denial.

Pending the litigation the State of Texas by permission of the court filed its petition in intervention, being represented by the Attorney-General, in which many exceptions to plaintiff's petition were made; and it was alleged (but not in the order here given):

"That by special laws, on the 5th day of August, 1870, and the 10th day of March, 1875, the State of Texas granted the charter and amended charter respectively to the said defendant the International & Great Northern Railway Company, which said charters are referred to and made a part of this answer. That under said charter and the general laws in force at the respective dates thereof and ever since, the said defendant company by contract with the State agreed and bound itself not to execute any mortgages or liens, or issue any bonds, or assume any indebtedness whatever, except for money, property, or labor that it should receive and apply to the purposes of the said corporation, which were, by the charter contract with the State, to construct, complete, equip, work, and operate the railway lines as described in plaint-iff's petition. That the bonds and mortgages described in said petition were not issued or executed for either money, property, or labor received by the company in any way, but were executed and fictitiously issued for no consideration whatever. That in 1879, under a decree of the Federal court for the Western District of Texas, at Austin, to satisfy all the indebtedness then existing against the said railway company or its property, all of said property, franchises, rights, privileges, and immunities of the defendant company were sold, and purchased by one John S. Kennedy et al., and all the indebtedness of said company which was a charge upon its property was then, there, and thereby fully and completely paid off and extinguished. That since said time the railways described in the petition have not been extended, equipped, or in any way benefited, but have grown annually, up to within the last twelve months, out of order and become dilapidated and almost useless to the public.

"That by decrees rendered in actions in the United States Circuit Court in session at the city of Austin, State of Texas, on the 15th day

of April, 1879, all property, rights, franchises, privileges, and immunities owned, held, or controlled by the International Railway Company, the Houston & Great Northern Railway Company (which at that time were one and the same under act of consolidation as the International & Great Northern Railway Company), were ordered to be sold to satisfy established liens for debt thereon. That in pursuance of said decrees and orders of sale the said railway property, franchises, rights, privileges, and immunities, and powers owned, held, or controlled by said railway companies under their said respective charters and the laws of this State, each and all were sold on the 31st day of July, 1879, to John S. Kennedy and Samuel Sloan and their associates (if any), parties plaintiff in another action in this court, No. 3137, for the aggregate sum of $1,000,000.

"That the report of said sales was duly made to the said Circuit Court, and that on the 4th day of August, 1879, the court being in lawful session, the said report of said sales by the said court made under the said decrees aforesaid was duly and in all things confirmed, and that the title to and all the said property became, with the rights, privileges, and franchises then and formerly owned and held by said International & Great Northern Railway Company, vested in the said John S. Kennedy and Samuel Sloan and their associates, and they were required to maintain and operate the property and railways, and to perform the corporate functions and obligations thereof, which they voluntarily assumed by said purchase. That soon thereafter the said purchasers and their associates, confederates, and allies, without authority and in violation of law, bargained, sold, conveyed, and delivered to the old sold-out company all the said properties, privileges, immunities, and franchises, including the franchise to be a corporation, so purchased by them at said sales, for the sum of $10,348,000, for and to secure the payment of which the said sold-out company, acting by and through its old set of officers and directors, executed and issued the mortgages and bonds herein sued on.

"That all of the said illegal acts, facts, and want of authority as herein set forth touching the validity of the mortgages and bonds set forth in plaintiffs' petition, the plaintiffs and their associates and each of the bondholders represented by them had notice. That said Kennedy and Sloan and their associates were parties to and fully knew of the issue of every illegal bond on which plaintiff seeks to recover in this case. The bondholders whom plaintiff represents herein fully knew of the want of authority in and as well as of the illegal acts by the said Kennedy, his associates, and the said defendant railway company in the issuance and promulgation of said bonds and the execution of said mortgage before the same ever went into their hands in the first instance. That in fact the said Kennedy and his associates who were parties to said illegal acts and the issuance of said bonds and the execution of said

mortgage have an interest in, own, and exclusively control and have ever held possession of said bonds and mortgage.

"That at the time and ever since said mortgage was executed and the bonds issued the said sold-out International & Great Northern Railway Company had no organization in fact nor in law. That it had no authority as such to execute said mortgage or to issue said bonds. That it had no legally authorized board of directors, nor did the stockholders thereof have any authority whatever, by themselves or through agents or the board of directors selected by them, or authority in any way, to control the International & Great Northern railway property after said sale, as described herein, under decree of the Federal court; nor did they or either of them, in any capacity whatever, have the right to execute a mortgage upon said railway property or to issue bonds or other pecuniary obligations that could legally become a charge upon or be paid by or out of said railway property."

The petition then alleges that the directors of the sold-out company became simply trustees for the creditors and stockholders of that company, empowered only to settle its affairs, and to that end to dispose of any property which did not pass from the sold-out company by the sale before referred to.

The petition then alleges "that all of the bonds, as well as mortgage to secure the same, described in plaintiff's petition, were issued and executed by the board of directors of the sold-out company, and not by any board of directors or agents elected or authorized by the said purchasers of said railway property at the aforesaid sale under the decrees of the Federal court, and that of all the foregoing facts the present plaintiffs and bondholders seeking to recover in this action had notice.

"The State further says that when the property described in plaintiffs' petition was sold to pay the indebtedness established against it in the Federal court at Austin, under the decrees of the court, by virtue of the laws of Texas then and ever since in force, all the officers and directors, managers, and stockholders originally interested in and exercising control over said property up to the time of said sale forever thereafter lost their franchises, privileges, prerogatives, and powers as a corporation, and as the owners, controllers, managers, directors, or stockholders in the property which was sold out under said decree.

"That the said Kennedy and his associates who were the purchasers of said property at said sale were the only persons who could thereafter lawfully control said property. That they were the only ones authorized under the laws of Texas to exercise the powers, privileges, and franchises granted to the said original sold-out company by its charter and the general laws of this State.

"That they were the only ones who could elect the board of directors or in any way exercise any lawful right or control in or over the

said purchased property or its affairs. That neither of the said purchasers or their agents or directors, individually or collectively, or as a board, executed or authorized to be executed the bonds or mortgages described in plaintiffs' petition. That of all these facts the said plaintiffs and bondholders before they came into possession of said bonds had full notice.''

The petition then alleged facts to show that the railway company had accepted benefits under legislation since the adoption of the present Constitution of this State, and claimed that thereby it had become subject to all the provisions of the Constitution applicable to railways, although under its charter-it may have possessed rights or powers, as claimed by the plaintiffs, which could not have been taken away without consent of the company.

Plaintiffs sought a foreclosure of mortgage on some railways, claiming them to be subject to their mortgage as property of the International & Great Northern Railway Company, and in reference to them the State's petition contained the following averments:

"That the line of railway from Georgetown to Round Rock, described in complainant's bill, was constructed, owned, and operated by the Georgetown Railway Company, a corporation created and organized under the general laws of Texas in 1878.

"That the line of railway from Henderson to Overton, mentioned and described in complainant's bill, was constructed, equipped, and operated by the Henderson & Overton Branch Railway Company, a railway created and organized by, under, and in virtue of a special act of the Legislature of the State of Texas, entitled 'An Act to incorporate the Henderson & Overton Branch Railway Company,' approved April 29, 1874.

"That the line of railway from Houston to Galveston, described and mentioned in complainant's bill, was constructed, equipped, owned, and operated by the Galveston, Houston & Henderson Railway Company, a railway corporation created and organized under and by virtue of a special act of the Legislature of the State of Texas, entitled 'An Act to incorporate the Galveston, Houston & Henderson Railway Company,' approved February 7, 1853.

"That each of said railway companies are valid, live, and subsisting corporations, authorized and required by the laws of Texas and their said charters to operate and maintain, respectively, their lines of railway aforesaid. That neither of the said railway companies ever possessed the power or had the consent of the State to rent, lease, or sell its railway, corporate property, or franchises to the International Railway Company, the Houston & Great Northern Railway Company, or to the International & Great Northern Railway Company, mentioned and described in complainant's bill, nor to the successors or assigns of either of said last named companies, nor to any other corporation or person,

nor did either of the said last named companies or any corporation or person whatever have the right or power to buy, rent, or lease from either of them any of its property or franchises.

"That neither of the first three companies mentioned in this paragraph was ever dissolved, nor was the property of either of them or their corporate rights or franchises lawfully conveyed or sold, or in anywise indebted or incumbered. That the bonds, mortgages, and each and all of them sued on and mentioned and described in complainant's bill are illegal and unauthorized, were issued and executed in violation of the laws of Texas, and constitute no legal or equitable claim against either of said three lines of railway."

The petition further alleges: "That said bonds and mortgages were issued and executed without a lawful resolution authorizing the same by the board of directors, and without any resolution whatever therefor having been recorded in the office of the Secretary of State, and without any public notice having been previously given of the purpose for which they were issued and executed. That they were in fact issued out of the State, beyond the domicile of the corporation, and without the lawful action or concurrence of the stockholders or the board of directors. That the same are fictitious, unlawful, and unauthorized. That if the decree prayed for by plaintiff should be granted, the said railway company will be forced to increase the rates on traffic over its lines, and thereby impose extra and onerous burdens upon the commerce of the country, in order to raise sufficient revenue to pay said fictitious indebtedness or to meet the interest thereon. That if the relief prayed for herein shall be granted, then the said rates will be materially decreased, and the public in that way greatly benefited."

It alleges a contract between the State and the railway company, whereby the latter, in consideration of a large land grant and exemption from taxation, obligated itself to maintain low freight and passenger rates, which it is claimed can not be done if the relief prayed for by plaintiff be granted; and further, that on account of their laches the defenses against the bonds and mortgages now urged by the State can not be made available to the stockholders or directors individually or collectively; and the State's petition then proceeds as follows, after alleging that the property was in the hands of receivers appointed in the case:

"That the State of Texas by its Attorney-General has made demand of said receivers and of the only organization pretending or in any way acting for or representing the said railway property as a corporation, and also of the only persons who claim to and do own all the stock of said company, to appear in this court and make defense which the State herein interposes against said bonds and mortgages. That it fully apprised the receivers and corporation, as well as the stockholders thereof, of all the facts set forth herein, and proposed to furnish proof of all the

allegations of fact made by the State, and requested each of them to appear in this court and protect the said railway property against the establishment of said false, fraudulent, and fictitious indebtedness on it by the decree of this court. That they and each of them have neglected, failed, and refused to do so, or in any way attempt to defeat and cancel the said bonds and mortgage, but each seemed willing to permit the same to be established by judgment against the said property. That the State believes and therefore charges that the organization known as the International & Great Northern Railway Company and its stockholders is composed of its competitor and rival the Missouri, Kansas & Texas Railway Company, the plaintiff, and said John S. Kennedy and his associates and bondholders, who in fact are privies and parties in both suits, have combined, colluded, agreed, and are now acting together for the unholy, iniquitous, and illegal purpose of establishing the claims described in plaintiffs' petition as a charge upon the railway property described therein. That said combination and conspiracy to establish said indebtedness as a charge upon said property is for the mutual benefit and the increase of their private fortunes, without equitable or legal right, at the expense of commerce, trade, traffic, and the general public of the State. That unless the court permits the State to be and remain a party in this action and defend against said fictitious bonds and mortgages the same will be established by decree of this court without resistance and by consent, collusion, and acquiescence of the aforesaid parties. That thereby unreasonable freight and passenger rates will be imposed upon the public, and that the corporation and railway created at the expense of the State for the public good will be used as an instrument of oppression and injury to commerce and the people who are forced from necessity to patronize the road. That if said parties or either of them should at any time interpose said defenses, which they each now refuse to do, they would be held estopped in law and equity because of their laches. The State now is the only party which can legally and successfully make said defenses; that it only discovered the facts herein alleged since last term of this court."

The petition closes with the following prayer:

"Premises considered, the State prays the court to overrule all the demurrers and exceptions of plaintiff to this plea of intervention and answer; that it be permitted as a party to the charter contract with the International & Great Northern Railway Company, in the interest of the general public, to remain and defend the action, to the end that justice may be done; that it be granted all the relief to which it is entitled in law or equity; that said company defendant and said receivers and their successors be forever restrained and prohibited from paying any portion of said bonds or mortgages; that the same be required to be brought into this court and canceled; that said plaintiffs, their agents,

and employes be forever restrained from using, negotiating, or in any way attempting to collect or enforce the same or any part thereof in any manner whatsoever; and for general and special relief.''

The court overruled demurrers to the State's petition in intervention, and in reply thereto plaintiff filed a supplemental petition, in which was given a history of the incorporation of the two railway companies, which, consolidated, became the International & Great Northern Railway Company. This supplemental petition alleged that prior to the sale of the property of the International & Great Northern Railway Company, referred to in the State's petition in intervention, the company was indebted by bonds secured by first mortgages in a sum amounting to more than $10,000,000, and that it was further indebted on bonds secured by second mortgages in a sum exceeding $8,000,000, to satisfy all of which the sale before referred to was made, at which Kennedy and Sloan became the purchasers for less than $1,000,000.

It is alleged, however, that long before the sale was made a reorganization committee had been appointed, and that under this the purchase was made by Kennedy and Sloan for the benefit of bond and mortgage holders; and what it is claimed occurred after the sale of the property is thus stated by plaintiffs:

"After the public sales aforesaid, but before the execution of any deeds, it was concluded by all parties interested that it was inexpedient to form any new corporation, and that it was advisable to reconvey the purchased property to the International & Great Northern Railway Company. The said Kennedy and Sloan thereupon, by direction of the entire purchasing committee, and with the consent and approval of all the beneficiaries of their said trust, agreed to reconvey and did reconvey all of the said railways and equipments so purchased by them to the said International & Great Northern Railway Company, subject to two purchase money mortgages of the said railways and equipment, executed simultaneously with the deed from the said Kennedy and Sloan to the said International & Great Northern Railway Company, and dated November 1, 1879. The first of said mortgages was made to the said Kennedy and Sloan, as trustees, to secure the payment of certain bonds to the amount in the aggregate of $5,624,000, and the second of said mortgages was made to Samuel Thorne, William Walter Phelps, and John S. Barnes, as trustees, and was executed to secure the payment of certain bonds to the amount in the aggregate of $4,724,000, with a proviso as to the issuing in the future of additional bonds for additional railways, as hereinafter stated. The mortgage indebtedness so recognized amounted, therefore, in all to $10,348,000, which was much less than the actual bona fide indebtedness of the said International & Great Northern Railway Company upon the bonds issued under and secured by the said two original first mortgages, as aforesaid. Thereupon the trustees of the said two original first mortgages called

in and surrendered to the International & Great Northern Railway Company all the bonds outstanding under said mortgages, so that the effect of this transaction was actually to diminish the amount of the mortgage debt of the said International & Great Northern Railway Company, the direct liability of that company now having been reduced by the sale of its railways and equipment."

The bonds sued on are claimed to be bonds issued under this arrangement, or bonds issued in place of them and since claimed to have been subsequently issued by the railway company in the legitimate course of its business.

This sufficiently manifests the case made by the State's petition in intervention, as well as the nature of the claim asserted by plaintiff; and as the latter is denied by the State, in the disposition of this case it will not become necessary to determine whether the plaintiff showed a cause of action against any person entitled to question the validity of the bonds and mortgage sued on.

On October 6, 1890, plaintiff made known to the court that it would no longer prosecute its suit, and on the same day the cause was dismissed by a decree which took the case out of court as to defendants and plaintiff, and in effect dismissed the State's petition in intervention with costs, to which the Attorney-General on behalf of the State excepted and gave notice of appeal.

Some question is raised as to whether the action of plaintiff and decree of the court operated as a nonsuit or a discontinuance technically, and it is claimed by appellees if it did not operate as a nonsuit that the State has no ground for complaint; but we think it unimportant whether it operated the one or the other, for if the State's petition in intervention alleged such facts as entitled it to intervene and to maintain a right in regard to the subject matter of litigation on which it asked affirmative relief, the court erred in dismissing the petition in intervention, thereby depriving the State of an opportunity in the case then pending between the State and plaintiff for a hearing on the merits of the controversy between them.

The important inquiry in the case is, Did the petition for the State allege such facts as would entitle it in an independent suit to such relief as was asked? Did it show such interest in the subject matter in litigation between the parties as would have entitled it to maintain an independent action against the plaintiff or those represented by it and to have therein the relief or some of the relief sought? If it did not, it had no right to intervene in the suit pending between other parties, and the action of the court worked no deprivation of right.

It is claimed on the part of the State that its petition stated facts which entitled it to relief, while for appellee it is urged that the court erred in overruling its demurrer to the petition in intervention. That demurrer presented the questions whether the petition showed a cause

of action on the part of the State, and whether, if it did, the relief prayed could be granted in a suit in which the trustee for the bond-holders was the plaintiff without making the bondholders parties.

If the Constitution or statutes of this State require or authorize the State to maintain an action on such a state of facts as is presented in the State's petition, then the right of the State to maintain such an action should be held to be thus determined, although the pecuniary interest of the public in the subject matter of litigation may not be shown or may appear to be very remote; and it would be unnecessary to inquire whether, under the general rules of law applicable to proper and necessary parties to actions, the facts pleaded showed such interest as would entitle the State to maintain the action in the absence of such requirement or authorization.

The Constitution provides that the Attorney-General "shall represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party, and shall especially inquire into the charter rights of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power, or demanding or collecting any species of taxes, tolls, freights, or wharfage, not authorized by law. He shall, whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law, and give legal advice in writing to the Governor and other executive officers when requested by them, and perform such other duties as may be required by law." Const., art. 4, sec. 22.

This section of the Constitution confers powers on the Attorney-General, and it also imposes duties which must be performed whenever facts arise which call for their performance; but it does not determine what facts in a given case will authorize him to bring and maintain a suit or action in behalf of the State, except by this general enumeration of cases in which it is made his duty to bring and maintain suits.

The duty to inquire into the charter rights of private corporations is to the end that when in his opinion based on such inquiry it becomes necessary to take steps to prevent the abuse of corporate power he may do so, but the final inquiry must in all cases be made in and through the courts as to whether in a given case the corporation has exercised a power not given by its charter or the general laws of the State which will authorize the State to sue to prevent an injury to the public.

By this section of the Constitution it is made the duty of the Attorney-General to take such action in the courts as may be proper and necessary to prevent any private corporation from demanding or collecting any species of taxes, tolls, freight, or wharfage not authorized by law, and as to such matters it is not only the right but the duty of the Attorney-General to institute and maintain in behalf of the State all

such suits as may be necessary to prevent the abuse of its franchise by any private corporation, for the demanding and collecting of taxes, tolls, freight, and wharfage affects the public; and as these are subject to State control there is a manifest propriety in the State instituting and maintaining such suits or actions as may be necessary to prevent private corporations from exercising franchises not conferred on them by law; but even in such cases it must rest with the court in which the suit or action is brought to determine whether a petition states such facts as entitles the State to its preventive or restraining process. It is not claimed that the petition of the State makes a case in which the railway company was demanding or collecting taxes, tolls, freight, or wharfage not authorized by law; but it seems to be contended that the petition does show a case in which the company will exercise a power not authorized by law, if not prevented, in that it will recognize and pay, so far as its property will do so, the bonds sued upon; and to prevent this the prayer of the State is that the bonds and mortgage be brought into court and canceled, and that the railway company, the receivers, and their successors be restrained and prohibited from paying any part of them, and that plaintiff, its agents, and employes be restrained from issuing, negotiating, or in any manner attempting to enforce their payment. The grounds on which the bonds are claimed to be invalid are stated in the petition.

The rule universally asserted is, that to entitle any person or corporation to maintain an action it must be shown that the one instituting the suit or action has an interest in the subject matter of litigation either in his own right or in a representative capacity, and a State is not exempt from this rule; though it ought to be conceded that such representative character could be established by a positive law when the relation would not be held to exist in its absence.

In view of this rule it has been steadily held that an action or suit can be maintained by an Attorney-General in behalf of the State for the redress of an injury to the public or to prevent this, and that he can not maintain a suit or action when private rights alone are involved. A statement of the cases in which it has been held that the public have or have not such an interest in the subject matter of litigation as to entitle an Attorney-General in behalf of the State to maintain a suit or action would now serve no useful purpose, but the inquiry arises whether such an interest is shown in this case.

Recognizing the necessity to show the public interest involved, it is alleged that the bonds and mortgages sued on are invalid; and for the purposes of this case, without intending to intimate any opinion as to their validity or invalidity, let it be assumed that they are invalid. This being assumed, does the petition show that the relief sought is necessary for the protection of any public right?

It is alleged that the State made large donation of lands to the International & Great Northern Railway Company, lands exceeding, with exemptions given, in value the entire value of all the company's property, "for the purpose and on the conditions that said railway company would have and maintain low charges upon the traffic of the country, and that by the obligations of said company it is bound to maintain low freight and passenger rates, which it can not do should the relief prayed for in the petition of plaintiff be granted; * * * that if the decree prayed for by plaintiff should be granted, the said railway company will be forced to increase the rates on traffic over its lines, and thereby impose extra and onerous burdens upon the commerce of the country in order to raise sufficient revenue to pay said fictitious indebtedness or to meet the interest thereon; that if the relief prayed for herein shall be granted, then the rates will be materially decreased and the public in that way greatly benefited."

Plaintiff's petition, among other relief, sought judgment against the railway company for the sum claimed to be due, and a sale of its property and franchises in foreclosure, whereby the right and power of the corporation as now organized, or claimed to be organized, to control the property and fix rates for transportation of passengers or freights would cease, and an averment that it would or would not do any given act can be entitled to no weight. With the sale of the railway and the franchises of the corporation all debts not secured by mortgage giving prior lien to that held by plaintiff as trustee would be extinguished, in so far as they could affect the title of the purchaser or purchasers to the property and franchises bought, or their right to operate the railway at such rates as under the law they might legally fix.

Whether, should the railway on sale not bring a sum sufficient to satisfy the judgment and debts not secured by prior mortgage, through any process of reorganization, the old indebtedness could in effect be kept alive it is unnecessary in this case to consider, and we only refer to the effect of such a sale as plaintiff was seeking for the purpose of illustrating the fact that the State's averments of future injury feared are not such as to show a threatened injury to the public by the acts of the corporation.

The charter of the Houston & Great Northern Railway Company provided that "the said company in its charges for freight and passengers shall be governed by the general railway law" (Special Laws 1866, p. 179), and the charter of the International Railway Company provides that "the State expressly reserves the right to regulate the rates of freight and passage upon said railway, making no distinction between said railway and any other in said State." Special Laws 1870, p. 110.

We find nothing in subsequent laws which withdraws from the State the power to fix rates for freight and passengers over the consolidated

road, and find no law or contract which deprives the State of the power through the Legislature to fix rates for the transportation of freight and passengers in accordance with the requirements of article 10, section 2, of the Constitution.

In accordance with the requirements of the Constitution the Legislature fixed maximum rates for the transportation of freight and passengers, which were in force when the State intervened. Sayles' Civ. Stats., arts. 4257, 4258b.

There is no complaint that the railway company at any time demanded or received higher rates than the maximums fixed by law, and as the law in terms applies to all railway companies there is no reason to. believe that in fixing the maximum rates the Legislature took into consideration the indebtedness of any company, whether real or fictitious; but if this were otherwise, as the power to fix maximum rates was conferred by the Constitution on the Legislature, relief in that respect should come through that department of the government and not through an appeal to the courts, which in the nature of things as the law stands could not give the relief. If in this case the court had retained jurisdiction and on final trial had granted all the relief the State asked, what good could have been accomplished by it through which the public would have been benefited? It would not be contended that the court could legally have made and enforced an order that the railway company, after the cancellation of the bonds alleged to be invalid, should transport freight or passengers at rates lower than the maximums fixed by law.

Courts can not give equitable or other relief to the State as the representative of public interests upon the sole ground that this may place a railway company in a position in which without injury to itself or creditors it might serve the public at a lower rate with profit to itself than could it if such equitable relief was not given, when under positive legislation no legal obligation would rest on the corporation to make the burden on the public less than the law expressly authorizes.

If the bonds in question are invalid, the railway company, if the averments of the State's petition be true, may have them so declared in any court in which plaintiffs may seek to enforce .their payment, or in any court to which the company may resort to have a sale made under the mortgage given to secure them restrained; and if the company does not desire thus to protect itself, is there reasonable probability that it would voluntarily lower.its freight or passenger rates in case a decree should be entered canceling the bonds in question? If, however, it was shown that this would be the probable result, could it be held that this would give the State, on the ground of public interest, the right to maintain this action? We think not, for to maintain such an action under the general rules governing equitable procedure it must be made to appear that the public interest will be subserved through

direct effect of the decree itself; and it is not enough to enable the State to maintain the suit that the decree to be entered would show the ability of the railway company to serve the public with profit to itself under a rate lower than the maximum fixed by law; for whether the service shall be rendered at the reduced rates must in such cases rest at last on the volition of the railway company, which the courts have no power to control directly or indirectly so long as the maximum rates fixed by law are not exceeded.

Averments as to what would be the effect of the failure of the court to cancel the bonds in question, or of its act canceling them, upon the cost of transportation and consequently on public interests, are not such as to entitle the State to maintain its intervention, for they are but conclusions drawn from facts which do not justify them.

It is suggested that by contract the State became entitled to have persons and property transported over the company's roads at a low rate of freight, but we find nothing in the charters bearing on this question other than the reservation of the right to regulate rates for transportation before referred to; but if this were otherwise, for reasons before stated we do not see that this would evidence the public interest in the questions involved in this case necessary to enable the State to maintain this suit under the general principles applicable to the right of the Attorney-General in behalf of the State to sue.

It is not believed that it was the purpose, by the section of the Constitution before referred to, to confer on the Attorney-General the power to institute and maintain an equitable proceeding such as this in every case in which a private corporation may exercise a power not conferred by law, without reference to the question whether such exercise of power is hurtful to some interest essentially public; nor is it believed that it was thereby intended to confer on him the power to institute and maintain suits to prevent the exercise of a power not conferred by law on such corporations, except in cases in which it is made to appear that the exercise of the power will be hurtful to some interest essentially public.   This view is strengthened by the connections in the paragraph of the section of the Constitution in which the general language which seems to be relied upon is found, for all these relate to matters in which the public have a direct interest.

The right of the Attorney-General in behalf of the State, through the courts, to prevent any private corporation from exercising any power not conferred by law when this is hurtful to the public, or the assumption of a franchise which in itself is a public wrong, can not be questioned, and would exist from the nature of the office in the absence of a constitutional provision expressly conferring it.

There are some other considerations that will be briefly noticed.

The corporate acts in this case claimed to have been committed without authorization of law were the issuance of the bonds and execution

of the mortgage made the basis of the plaintiff's action, but that occurred in 1881, and now it is alleged, not that the corporation proposes to do any act in excess of its powers, but that it refuses to make the necessary defenses and intends to permit the court to render a judgment against it that ought not to be rendered. If this is true, it may violate its duty to its stockholders and fail in its duty to the State to preserve its funds that may be necessary to the discharge of its duties to the public, but this would not be the exercise of a power not conferred by law but the failure to exercise a proper and necessary power, which would not present a case within the letter or spirit of the Constitution entitling the State to a preventive remedy as against the bondholders, mortgagees, or trustees, unless it was shown that the public had an interest in the nonpayment of the bonds through foreclosure or otherwise; even if the State would have had the right without any public interest being shown to prevent the issue of the bonds and execution of the mortgage, or at time of intervention would have been entitled to a legal remedy through which bondholders might ultimately be affected.

It is in effect alleged that the bonds and mortgage sued on were not issued by the railway company, by its directors, or by any person authorized to represent the company; and while the averments as to these matters are largely conclusions, if they be conceded to be true it necessarily follows that the railway company in this respect performed no act unauthorized by law in the issuance of the bonds and execution of the mortgage which could give the State cause of action against it; and again the State would be driven to the nonaction of the corporation as the basis of its intervention, which as against plaintiff can not be sustained, as before said, in the absence of an interest in the public to be protected.

It becomes unnecessary, in the view taken of the questions considered, to determine whether the State could maintain its intervention unless the owners of the bonds and beneficiaries in the mortgage were parties, and as the case is presented we are not called upon to express any opinion as to the validity of the bonds and mortgage sued on, nor as to many other issues presented by the pleadings; but because the State's petition did not show a cause of action which entitled it to intervene in this action and to have the equitable relief sought, the judgment of the District Court must be affirmed; but as the court below overruled a demurrer to the petition of the State, the affirmance will be without prejudice to the State's right hereafter to maintain any action or suit that may be proper. It is so ordered.

*Affirmed.*

Delivered June 23, 1891.