[MEMORANDUM] RANDOLPH MANNING, one of the Associate Justices of the Supreme Court, having departed this life during the vacation preceding this term, and the vacancy on the bench not being yet filled, the present term was held by three Justices only.]

## The People on the relation of the Attorney General v. The President, Directors and Company of the Bank of Pontiac.

*Corporation: forfeiture of franchise by nonfeasance* — The statute, *Comp. L.* §4854 which provides that "whenever an incorporated Company shall have remained insolvent for one whole year," &c., "it shall be deemed to have surrendered the rights, privileges and franchises granted" by its act of incorporation, "and shall be [adjudged to be dissolved," is applicable to corporations chartered before the statute was passed.

The forfeiture must be declared in a judicial proceeding; and until the State chooses to insist upon the forfeiture, no one else has the right to question the existence of the corporation collaterally.

But when a corporation has been guilty of such a breach of the condition of its existence or continuance as to authorize a forfeiture of its charter, it can not legally atone for such misconduct, and avoid the forfeiture, by subsequent good behavior.

Where a bank became insolvent and suspended operations in 1840, and did not resume again until 1864, it was held that the State had not, by laches, lost its right to insist upon the forfeiture under the statute above quoted. The State shows sufficient diligence (if any is required) if it institutes proceedings and claims the forfeiture within a reasonable time after a resumption of business, or an attempt to resume, on the part of the corporation.

Only fourteen months of the chartered existence of the bank remaining unexpired, when it resumed business after a suspension of twenty-four years, the Court, if it has a discretion so to do under the statute, will not impose a fine instead of adjudging a forfeiture of the charter.

*Submitted July 14th. Decided October 11th.*

THE PEOPLE v. BANK OF PONTIAC.

Information in the nature of a quo warranto.

The Attorney General filed his information against the defendants, charging them with usurping banking franchises. The defendants filed their plea .thereto, claiming to be exercising such franchises by virtue of a charter granted by the territorial council of the territory of Michigan, on March 26th, 1835, under which they organized April 23d, 1835. To this plea the Attorney General interposed three replications, the second and third of which only were considered by the Court. They are as follows:

"And the said Attorney General further saith, that the said People ought not to be barred etc., because he says that after the passage of the said act of incorporation in the plea of the said The President, Directors and Company of the Bank of Pontiac mentioned, and after the said The President, etc., had entered upon the business of banking, to wit: on the first day of May, 1840, large amounts of the bills, notes and evidences of debt of the said The President, etc., had been put into circulation by the said The President, etc., and then were in circulation; and that while the said bills, notes and evidences of debt were in circulation, to wit, on the day and year last aforesaid, the said The President, etc., by the fraud, neglect or mismanagement of them or of some or all of their officers or agents, became wholly insolvent and unable to redeem the said bills, notes and evidences of debt so in circulation, in specie or other lawful money of the United States; wherefore the said The President, etc., to wit, on the day last aforesaid, discontinued, ceased and closed their banking operations, and from that time afterwards, to wit, until the first day of February, 1864, neglected to resume their banking operations; and this he, the said Attorney General, is ready to verify," etc.

"And the said Attorney General further says, that the said People ought not to be barred, etc., because he says,

that after the passage of the said act of incorporation, in the said plea mentioned, and after the said The President, Directors and Company of the Bank of Pontiac had entered upon the business of banking, to wit, on the first day of May, 1839, the said the President, etc., received from sundry persons large sums of money on deposit, and that afterwards, to wit, on the first day of May, 1840, and while the said sums of money still remained on deposit with them, they, the said The President, etc., by the fraud, neglect or mismanagement of them, or of some or all their officers or agents, became wholly insolvent and unable to pay the said sums of money so deposited, in lawful money of the United States, wherefore the said The President, etc., to wit, on the day last aforesaid, discontinued, ceased and closed their banking operations, and from that time afterwards, to wit, until the first day of February, 1864, remained wholly insolvent, and neglected to resume their banking operations; and this he, the said Attorney General, is ready to verify," &c.

The defendants rejoined as follows:

"And the said defendants, the said President, Directors and Company of the Bank of Pontiac, as to the said plea of the said Albert Williams, Attorney General, secondly above pleaded in reply to the aforesaid plea of them the said defendants, protesting that the said replication and the matters therein contained are not sufficient in law to convict them the said defendants, of the premises in the said information above charged upon them, nor to remove them from the liberties, privileges and franchises aforesaid, and that they need not nor are they bound by the law of the land to answer thereto, yet for a rejoinder in this behalf, the said defendants say that they, the said President, Directors and Company of the Bank of Pontiac, afterwards, to wit, on the second day of February, 1864, and before the filing of the information in this behalf, and at Pontiac aforesaid, became and were, and ever since have

been, and still are, wholly solvent and able to redeem in the lawful money of the United States, their bills, notes and evidences of debt, and that they did then and there resume, and have since continued their banking operations; and this they, the said defendants, are ready to verify, etc.

" And the said defendants, the said President, Directors and Company of the Bank of Pontiac, as to the said plea of the said Albert Williams, Attorney General of the State of Michigan, by him thirdly above pleaded, in reply to the said plea of the said defendants, protesting that the said replication and the matters therein contained are not sufficient in law to convict them, the said defendants, of the premises in the said information above charged, nor to remove them from the liberties, privileges and franchises aforesaid, and that they need not nor are they bound by the law of the land to answer thereto, yet for a rejoinder in this behalf, the said defendants say that they, the said President, Directors and Company of the Bank of Pontiac, afterwards, to wit, on the second day of February, 1864, at Pontiac aforesaid, and before the filing of the information in this behalf, became and were and still are wholly solvent, and able to pay all sums of money on deposit received by them and remaining with them, and that they did then and there resume their banking operations, and have ever since exercised and still do exercise them, and that they are able and ready to pay all their indebtedness on demand; and this they, the said defendants, are ready to verify," &c.

The Attorney General demurred to these rejoinders.

*A. Williams, Attorney General,* and *T. M. Cooley* for the People:

The question involved in the case is whether, where a bank is chartered for a period of thirty years, and after being five years in operation, it then becomes insolvent, and unable to pay its circulating notes, and thereupon

suspends its operations until but a single year of its chartered life remains, it may then, after having for nearly five-sixths of its corporate existence totally failed in the object of its creation, excuse its corporate nonfeasances and misfeasances by simply showing that it has now, at the eleventh hour, become able to pay its debts, and again commenced issuing its bills?

That the charter of a corporation implies and requires that it shall perform the business for which it was instituted, and that a substantial suspension of the same after the commencement is a violation of the charter, is too well settled for question:—*Matter of Jackson Marine & Fire Ins. Co.,* 4 *Sandf. Ch.* 559; *Ward v. Sea Ins. Co.,* 7 *Paige,* 294; *State v. Bank of South Carolina,* 1 *Speers,* 433; *State v. Commercial Bank,* 10 *Ohio,* 539. See also, *Lumpkin v. Jones,* 1 *Kelly,* 27; *State v. Real Estate Bank,* 5 *Pike,* 596; *Commonwealth v. Commercial Bank,* 28 *Penn.* 383; *Attorney General v. Bank of Michigan, Har. Ch.* 315; *Cases collected in A. & A. on Corp.* § 774, *notes.*

Indeed the doctrine of these authorities is fully admitted by the pleadings, and the defense relied upon is, the resumption of business before information filed. Our position is, that where a misuser of their franchises has once been committed by a corporation, or a breach of the conditions enjoined upon them as conditions of their creation and continuance, sufficient to forfeit their charter, mere subsequent good behavior in such respects will not legally atone for such a cause of forfeiture :—*People v. Fishkill & Beekman Plank Road Co.,* 27 *Barb.* 458; *People v. Hillsdale & Chatham Turnpike Co.,* 23 *Wend.* 254.

The case before the Court is hardly a case of *subsequent good conduct.* There is here only an *attempt* to resume after twenty-four years suspension. The State had good reason to suppose, from the long inaction, that the corporation had designed a surrender of their charter.

Near the time of its termination, however, the authorities hear of an intention to resume.

The putting out a large circulation as the charter is about to expire is hardly consistent with honest intentions. The State, therefore, takes proceedings to insist upon the forfeiture which has occurred. But, before these proceedings can be actually commenced, the corporators succeed in throwing the doors of their office open to the public. At the very most, this case only amounts to an *offer* to return to good conduct.

But the State, under the circumstances, declines to accept it. The State has not acquiesced in the corporation returning to its business, and consequently has waived no right to insist upon the forfeiture. It has taken action immediately on the corporation evincing a design to resume.

But we claim that, by a general provision of statute, the charter in question is shown to be forfeited, by a total suspension of business for one year, and continued insolvency during that period:— *Comp. Laws*, § 4854.

The only question that [can arise on this point is, whether this provision can apply to the corporation in question, which was chartered before the statute was passed. But applying it to prior charters takes away no vested right, violates no contract, and inflicts no punishment. It simply fixes a period beyond which a continued misuser or nonuser should be fatal to the corporate existence. A corporation has no right whatever to suspend the performance of its corporate duties. That it will do so is not usually within legislative contemplation when charters are granted. The right to suspend is certainly no part of the contract with this corporation.

It is not necessary for us to claim that this act applies to this corporation, so as to forfeit its charter for the suspension for a year *before* the act was passed. But we insist that it was competent to pass such a law looking

to the future, and applicable to pre‑existing corporations.
See *People v. Hillsdale & Chatham Turnpike Co.*, 23
*Wend.* 254.

The statute is in some sense a police regulation, and
may be sustained on similar grounds.

It is also analogous to statutes of limitation. At most
this corporation could only have the right to resume busi‑
ness after suspension, in a reasonable time. To fix that
reasonable time must be within the proper province of
legislation. It is always competent for the legislature to
declare within what reasonable time a party shall assert
his rights, and statutes of limitation which apply to pre‑
existing demands are to be construed as if the demands
accrued at the date of the passage of the statute : — 8
*Wend.* 661 ; *Lastly v. Cramer*, 2 *Doug. Mich.* 312.

*T. Romeyn* and *M. L. Drake* for defendants :

Can the State, after acquiescing for a long time in the
suspension of business by a corporation, oust it of its
chartered rights, on account of such suspension, after the
corporation has resumed and is exercising its proper func‑
tions ?

We concede that the acts stated in the replication
afforded good ground for forfeiture, if there had been no
resumption. We admit the doctrine of the duty of cor‑
porations to exercise their corporate powers, as expressed
in *Ward v. Sea Insurance Co.*, 7 *Paige*, 297. This is a
condition of the grant of the franchises. The corporation
having been regularly formed, it is a condition *subsequent*
that it shall discharge its legal duties, or the grantor
may enter and oust it. Its right to its franchises, in such
case, is a *voidable* estate. But such estate may be con‑
firmed ; and it is an elementary principle in relation to
corporeal hereditaments, that if the condition is substan‑
tially complied with, at any time before the grantor has

made entry, he can not claim the forfeiture. He is deemed to have acquiesced and waived.

The position of the relator is, that insolvency for any time more than a year is ground for forfeiture, although there may have been a payment of adequate capital and an actual resumption of business before the information.

[Our statute declaring one year's suspension of business a cause of forfeiture, *Comp. L.* § 4854, is *cumulative* to the common law causes, and authorizes and requires a court to declare a forfeiture for such suspension : — *Bradt v. Benedict,* 17 *N. Y.* 93.]

Apply the doctrine to what we know historically to have been the course of the Michigan State Bank. After it had resumed, had acquired new stockholders and fresh capital, ¡and become the leading institution in the State, would this Court have arrested its business and declared its charter forfeited?

Our first legal position is, that the continued suspension of business and admitted insolvency of the bank did not operate as a dissolution or surrender of the franchise. *Town v. River Raisin Bank,* 2 *Doug. Mich.* 538, settles this point. See, also, *Mickles v. Rochester City Bank,* 11 *Paige,* 125; *Atchafalaya Bank v. Dawson,* 13 *Louisiana,* 497.

We next contend that the resumption of business by the bank, before information filed, is an answer to the information. See *People v. Bank of Niagara,* 6 *Cow.* 211.

This case is criticised in 23 Wendell, at page 258, but it will be seen that in the last case *it did not appear that the corporation had complied ⸢with its charter when the suit was brought.*

We have been unable to find a single case in which the court has granted judgment of ouster for insolvency, or any other removable cause, not connected with the *creation* of the corporation, and not in the nature of a con-

dition *precedent*, and not admitting of being repaired, when such cause had ceased to operate.

The *analogies* of the law are all against it. If a tenant is bound to repair or to do any other thing, and omit it, and the landlord do not enter while the tenant is in default, can he do so after the tenant has complied with the agreement?

There may be cases where there can be no atonement —where there have been acts of *malfeasance*, positive and willful. But where the act complained of is in the nature of a *nonfeasance*, as the non-election of directors, or the permitted dormant state of the corporation, and no action is taken by the State until such cause has been removed, it is believed that no instance can be found where a forfeiture has been declared.

We insist, further, that this rule of law is supported by the undoubted history of corporations in this country.

Finally, we ask the Court to regard the *consequences*.

The question is upon *the general principle* involved in the decision sought by the Attorney General. More than half of the mining companies on Lake Superior would fall before its application.

And where an information has been allowed by the Court to be filed, or where it is filed by the Attorney General officially, the Court has no discretionary control over the proceedings, but must pronounce the strict judgment of the law: — *State v. Brown*, 5 *R. I.* 1.

CHRISTIANCY J. :

By an act of the Legislature, of April 5th, 1839 — Laws of 1839, p. 104, § 49 (which, with slight alterations of phraseology, was incorporated in·the Revised Statutes of 1846, Chap. 117, § 8.; Comp. L. Ch. 155,)—it was expressly provided that, " whenever any incorporated company shall have remained insolvent, or shall have neglected or refused to pay its notes or other evidences of debt, or shall have

suspended the proper and legitimate business of such corporation, for one whole year; it shall, in either case, be deemed to have surrendered its rights, privileges and franchises, and shall be adjudged to be dissolved."

The rejoinder of the respondents to the second replication admits that, having previously organized and entered upon the business of banking, the corporation became insolvent on the first day of May, 1840, and on that day ceased, discontinued and closed their banking operations, and from that time until the first day of February, 1864, neglected to resume such banking operations; but alleges that, on the second day of February, 1864, they became and were, and ever since have been, and still are, solvent; that, on the last mentioned day, they resumed and have since continued their banking business.

The rejoinder to the third replication admits that, having previously organized and entered upon the business of banking, the corporation became insolvent on the first day of May, 1840; that on that day they discontinued, ceased and closed their banking operations, and that from that time until the first day of February, 1864, they remained insolvent and neglected to resume their banking operations; but alleges that, on the second day of February, 1864, they became and were, and ever since have been, and still are, solvent; and that they then resumed their banking operations, and have ever since exercised, and still do exercise them, &c.

These admissions bring the corporation directly within the provisions of the act of 1839, and the Revised Statutes above cited, so far as relates to the continued insolvency and suspension of business for a year.

We see no reason to doubt the validity of the statute, either in its application to charters of incorporation previously existing, or to those subsequently passed. Any of the grounds mentioned in the statute, upon which a surrender is to be presumed and the corporation is to be

dissolved, would have been good cause of forfeiture at common law; and this though they might not have continued for an entire year. Each would constitute a violation of the duty which the corporation, by accepting the charter, undertook to perform, as the consideration of the grant. And it is well settled that it is a tacit condition annexed to every grant of incorporation, that the corporation shall act up to the end or design for which it was incorporated: — *Ang. & A. on Corp.* § 774. And see *Matter of Jackson Marine & Fire Ins. Co.*, 4 *Sandf. Ch.* 559; *Ward v. Sea Ins. Co.*, 7 *Paige*, 294; *State v. Bank of South Carolina*, 1 *Speers*, 433.

The respondents do not deny the correctness of this position: they admit that the acts or derelictions stated in these replications, and admitted by the rejoinder, would constitute good ground of forfeiture if the bank had not become solvent and resumed business before the filing of the information. But it is insisted that the bank did not become, *ipso facto*, dissolved for the causes mentioned; that its corporate existence continued till the State should see fit to enforce the forfeiture; that the failure of the State to insist upon the forfeiture, by the institution of judicial proceedings, must be construed as an acquiescence, on the part of the State, in the failure of the corporation to perform the condition of the grant, and that this acquiescence, having continued until the corporation became solvent and resumed business, operates in some way as a remission of such past transgressions, or a waiver of the right to insist upon a forfeiture on that ground.

It is true the facts admitted did not operate, *ipso facto*, to dissolve the corporation without a judicial proceeding for that purpose; this was necessary on the part of the State to ascertain judicially the existence of these facts; and until the State chose to insist upon the forfeiture, no one had a right to question the existence of the corporation collaterally. The State might, through the Legislature,

12 MICH.—2 I.

choose to waive the forfeiture entirely; and we are bound
to presume they would do so in all proper cases. But I
am not aware of any case in which it has been decided
that a corporation, having been guilty of such a breach
of the conditions of its existence or continuance as to
authorize a forfeiture of its charter, could legally atone
for such misconduct, and avoid the forfeiture by subse-
quent good behavior. The contrary has been several times
held in the courts of New York: — *People v. Fishkill
and Beekman Plank Road Co.*, 27 *Barb.* 458; *People v.
Hillsdale and Chatham Turnpike Co.*, 23 *Wend.* 254; and
see *Matter of Jackson Marine and Fire Ins. Co.*, 4 *Sandf.
Ch.* 559. In the case above cited from 23 Wendell, 254,
was it justly said by the court that "the argument [the
same here urged by the respondents] goes to prove that
a corporation may practice all manner of abuses, by com-
mission or omission, if it be careful to stop before the
Attorney General can be informed and institute a prosecu-
tion." In *The People v. Bank of Niagara*, 6 *Cow.* 211,
relied upon by the counsel for the respondents, no such
question was involved.

. We can see no ground for holding that the neglect
of the State to prosecute for a forfeiture in this case
should operate as an acquiescence on the part of the State
in the breach of the conditions of the charter, or as a
waiver of any forfeiture for such breach. This corporation
became insolvent and suspended its corporate business in
the face of an express statute of the State then and ever
since in force, which expressly declared that any corporation,
remaining thus insolvent or thus suspending its business
for [one year, should be deemed to have surrendered its
corporate rights and franchises. The neglect, therefore, of
the corporation for one year to restore its solvency, or to
resume its business, would justly authorize the legislative
and the executive departments of the State to infer that
the corporation intended, by this neglect, to abandon or

surrender to the State all claim to any corporate rights or franchises; that it had no intention to attempt their resumption, and that no proceeding on the part of the State would therefore become necessary to put an end to its corporate existence; and this inference would naturally be strengthened with every year's continuance of such neglect. The Legislature would naturally act upon this inference, in judging of the propriety of granting other charters of incorporation, to supply the public wants or convenience which this corporation had once been designed but had failed to subserve. See opinion of the Vice Chancellor in *Matter of Jackson Marine and Fire Ins. Co.* above cited.

We think, therefore, that after this corporation, in the face of this statute, had allowed itself to remain insolvent and its corporate powers to lie dormant without an attempt to fulfill the purposes of its creation for a whole year, the State shows sufficient diligence (if any be required) if it proceed to institute proceedings, and to claim a forfeiture, within a reasonable time after it is informed of the first visible manifestations of returning life, or of the first public indication of an intent to assert its legal existence by the exercise of its original franchises. The resumption of business, therefore, or the attempt to resume after having remained insolvent, and to all outward appearance inanimate, for nearly a quarter of a century, is rather a justification for, than a bar to, this proceeding by *quo warranto*. The People are therefore entitled to judgment upon the demurrer to the rejoinder, with costs.

In some cases of *quo warranto* against corporations, where the forfeiture is sought on the ground of a usurpation of some power not granted by the charter, or for some single act of misfeasance, malfeasance or neglect, and the corporation has been found guilty, courts have exercised a discretion, and imposed a fine, instead of adjudging a forfeiture of the charter. But if we have any discretion under

this statute, which expressly declares that the corporation shall for such acts or dereliction be dissolved—a question we shall not here discuss—we are unable to discover any fact or circumstance in the conduct of the respondents to call for the exercise of such discretion in mitigating the penalty of forfeiture which the statute has pronounced.

After having remained insolvent and ceased to transact business for nearly twenty-four years, they make this ostensible attempt to resume, and to assert the right of issuing bank notes, when less than fourteen months of their chartered life remained, and when, if it had all along continued its business, and been actuated by honest motives, it would naturally be making arrangements to call in its paper and to close its business. The attempt to resume under such circumstances, and at so late a period of its chartered existence, is at least somewhat suspicious, and not calculated to produce the conviction of an honest purpose. The judgment of the Court must therefore be, that this corporation has surrendered its rights, privileges and franchises; that it be ousted and altogether excluded therefrom, and that the corporation be dissolved.

The other Justices concurred.