## STATE v. DILBECK et al. (No. 7157.)

Court of Civil Appeals of Texas. Austin. July 20, 1927.

**1. Insurance ⬅48—State held to have right to question right to exercise corporation's franchise originally granted by it (Act Aug. 3, 1870 [6 Gammel's Laws, p. 595]).**

Where individuals assumed to exercise franchise of life insurance corporation, which had been inactive 45 years, regardless of their showing of right under original incorporators, state had right to question exercise by them and by corporation of corporate franchise originally granted by it in Act Aug. 3, 1870 (6 Gammel's Laws, p. 595).

**2. Insurance ⬅48 — Nonuser of corporate powers for 45 years held to cause loss of powers (Act Aug. 3, 1870 [6 Gammel's Laws, p. 595]; Const. of 1876).**

Where corporation organized under Act Aug. 3, 1870 (6 Gammel's Laws, p. 595), and exercising rights thereunder for some time, became dormant and did not exercise any powers or rights whatever for over 45 years, such nonuser caused loss of such corporate powers, regardless of attempt by certain individuals thereafter to resume corporate activity, especially in view of fact that charter could not have been granted after adoption of Constitution of 1876.

**3. Corporations ⬅592½—Corporate franchise can be forfeited by de facto dissolution or de jure dissolution (Rev. St. 1925, arts. 1387–1395).**

Forfeiture of corporate franchise regulated by Rev. St. 1925, arts. 1387–1395, may be either by de facto dissolution or de jure dissolution.

**4. Corporations ⬅596—Total nonuser of corporate functions for period sufficient to raise presumption of voluntary surrender of rights to state will work forfeiture of rights of private corporation.**

Total nonuser of corporate functions and abandonment of all vestige of corporate existence for period sufficient to raise presumption of voluntary surrender of rights to state will work forfeiture thereof and support dissolution of private business corporation.

**5. Insurance ⬅48—Secretary of state's filing charter amendment and insurance commissioner's receiving application for permit to write life insurance held not to estop state to forfeit corporation's franchise for nonuser.**

Filing of amendment to charter of corporation, which had been dormant for 45 years, by secretary of state was scarcely more than ministerial act, and in connection with insurance commissioner's receiving application for permit to write life insurance, which was not granted, did not estop state from insisting on forfeiture of corporate franchise for nonuser of corporate powers for 45 years.

**6. Insurance ⬅4—Corporation chartered prior to regulatory statutes held subject thereto and required permit (Act Aug. 3, 1870 [6 Gammel's Laws, p. 595]).**

Life insurance corporation chartered by Act Aug. 3, 1870 (6 Gammel's Laws, p. 595), although it received charter prior to statutes regulating insurance and creating department of insurance, was subject thereto, and before it could engage in insurance business thereafter was required to obtain prescribed permit.

**7. Insurance ⬅49—Attorney General held to have authority under statutes, or at common law, to sue to forfeit franchise of life insurance corporation for nonuser (Rev. St. 1925, arts. 4408, 6253).**

Under Rev. St. 1925, arts. 4408, 6253, or at common law, Attorney General acting for state may maintain action against life insurance corporation to forfeit its franchise for nonuser.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit in the nature of quo warranto by the Attorney General, in the name of the State, against W. D. Dilbeck, the Bankers' Life Insurance Company, and others. From a judgment for defendants, the State appeals. Reversed and remanded, with instructions.

Claude Pollard, Atty. Gen., and R. B. Cousins, Jr., Asst. Atty. Gen., for the State. W. J. Rutledge, Jr., of Dallas, for appellees.

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

McCLENDON, C. J. Suit by the Attorney General, in the name of the state, against W. D. Dilbeck and other named individual defendants, and the Bankers' Life Insurance Company (the latter claiming under change of name to exercise the rights and franchises of the Texas Mutual Life Insurance Company created by special act of the Legislature in 1870).

"The suit was a proceeding in the nature of a quo warranto, having two purposes: (1) To call in question the right of the individual defendants to exercise the corporate rights, privileges, and franchises under which they were assuming to act; and (2) to oust or cancel the franchise or charter under which the Bankers' Life Insurance Company is undertaking to act, if the individual defendants prevailed as against the first part of the action."

The Texas Mutual Life Insurance Company ceased to function about the year 1880, and nothing was heard of it from that time until the year 1925, when the individual defendants, claiming to have acquired the rights of the original incorporators, attempted its reorganization, changed its name to the Bankers' Life Insurance Company, and began doing a life insurance business.

The contentions upon which the state rested its suit follow:

(1) That the individual defendants had not met the burden resting upon them to affirmatively show their right to exercise the corporate franchise, in that there was no showing that they had acquired the rights of the original incorporators, or any of them.

(2) That by failure to perform any corporate function for the period of 45 years, the right to exercise the corporate franchise had been lost by nonuser or abandonment; that, therefore, the state had the right to reclaim and have declared forfeited the franchise granted by the act of 1870.

(3) That the corporation had violated the terms of its charter in failing to elect directors, and thereby had committed an act entitling the state to the forfeiture.

(4) That in the attempted reorganization there had been no compliance with the present regulatory laws governing life insurance business; no certificate authorizing it to do business had been granted by the insurance commissioner; and that the character of business it was conducting was not in conformity with the life insurance laws in various designated particulars.

We will note the countercontentions of defendants under our discussion of the above contentions of the state.

The case was tried to the court upon agreed statement of facts. Judgment was for defendants, and the state appeals. No findings of fact or conclusions of law were requested of or filed by the trial court. We summarize from the agreed facts:

By special act of the Legislature of August 3, 1870 (6 Gammel's Laws of Texas, p. 595), T. H. McMahan and seven others, their successors and assigns forever, were created a body corporate and politic, under the name of Texas Mutual Life Insurance Company, for the purpose of doing an insurance business. The capital stock of the corporation must be not less than $100,000, which might be increased by the stockholders to not exceed $1,000,000, divided into $100 shares. Each subscriber must pay per share originally $5 and additionally $5 within 60 days after organization of the corporation, the remainder by bond or note, with either real estate or personal security. The corporate office was located at Galveston; its affairs conducted by a board of not less than seven nor more than thirteen directors (chosen annually after the first year by the stockholders), who were to hold office until the first Tuesday in October next ensuing their election or appointment, and until others were chosen in their place. The annual stockholders' meeting was to be held in Galveston, on the first Tuesday in October, or on such other day in the month of October as might be determined by by-laws.

The charter provision, under which the state's third contention above is based, reads:

"If it shall so happen that an election of directors of said corporation shall not take place at the time of the annual meeting thereof, in any year, said corporation shall not be dissolved thereby, but an election may be had at any time within one year thereafter, the time to be designated and notice thereof given by the directors."

The other provisions of the charter need no special notice. It was agreed the corporation was organized and began doing a life insurance business which it continued until about January 1, 1880. This agreement was predicted upon newspaper advertisements, a few extant policies issued, and some letters written by the officers, and not upon any corporate record evidence. Whatever of books or records the corporation may have kept had been lost or destroyed, and what became of them "no party to this lawsuit knows." Some of the company's stationery still extant and a policy issued May 20, 1873, contained a statement that the corporation's authorized capital stock was $1,000,000, and the capital paid up and secured $300,000; "except for this evidence nothing is known by any parties to this lawsuit about the amount of the capital stock authorized, subscribed, or paid in, nor is it known whether such capital stock was collected in cash or was represented by notes, property, or what not." An item in the Galveston Daily News, of October 24, 1875, states that on the previous day thirteen named persons were elected directors of the corporation. The Galveston city directories from 1871 to 1875 carried advertisements of the company, giving the

names of its officers and directors, and stating that directors' meetings were held monthly. "This is the only accurate information with respect to the personnel of the directors at any time during the period that it was in business." The state admitted this evidence sufficient to show an acceptance by the incorporators of the provisions of the act prior to 1876. About January 1, 1880, the corporation ceased business, and its capital stock became "impaired and dissipated." From then until August, 1925, no effort was made by any person to transact any sort of business under authority of its charter; no stockholders' meetings were held; no directors elected.

"It is not known why the concern ceased operations, or whether its affairs were wound up, whether its claims were paid in full or whether it owed money that was never paid, or whether there was any distribution of any assets among its stockholders. No party to this lawsuit knows or has any positive information, except such as may result from the above statements, as to the names or number of persons holding stock in the said company at the time the same ceased operations."

In July and August, 1925, various persons claiming to be heirs of certain members of the board of directors named in above advertisements, or of original incorporators, made assignments of such interests as they inherited from their several ancestors. Under these assignments Dilbeck and the other individual defendants, on August 28, 1925, held a stockholders' meeting in Galveston, and elected Dilbeck and three others directors of the corporation. These then met and passed a resolution, changing the corporate name to Bankers' Life Insurance Company, and the principal office from Galveston to Dallas. Certificate showing this action was filed with the secretary of state September 2, 1925. Immediately following, the corporation began to write life insurance under two plans noted below, the first policy written being of date October 27, 1925. $300,000 of stock was issued to the various stockholders, which was paid for in the main by personal services, the nature of which does not appear. There was contributed to the corporation the sum of $10,000 in cash and the remainder of its tangible assets, amounting to $66,533, consisted of membership fees, assessments for death claims, assessments for surplus fund, and miscellaneous collections; $51,914 of which had been expended in medical fees, commissions, officers' salaries, death claims, office rent, office salaries, and general miscellaneous items. At date of trial the corporation had in cash $19,428.70, premiums in process of collection $2,180, office equipment worth $2,000; its then liabilities were $5,000 upon approved death claims and $250 miscellaneous items. At no time had it tangible assets to the extent of $100,000. It then had in force $10,000,000 of insurance written on the assessment plan, under two forms of policy: One insured for $1,000, but obligated the company to pay only out of collections from assessments against other policy holders; the other insured for $5,000, and differed from the first only in the amount of assessment against the policy holders of that class.

On October 20, 1925, the company officials interviewed the state commissioner of insurance for the purpose of ascertaining what would be the requirements of his department in order to obtain a permit to write life insurance in Texas. Later (date not given) the corporate officers were notified that there was nothing that could be done to obtain such permit, and that the department would, under no circumstances, issue a permit for the corporation to engage in the life insurance business. At that time the corporation had begun writing life insurance and had made agreements under which there was being transferred to it a large amount of life insurance. On November 1, 1925, the commissioner of insurance in person made demand upon the company for permission to investigate its affairs and audit its books, and a similar demand was made on the same day by the deputy commissioner of insurance. Both demands were refused. No other demands were made by the department; and no report of the condition of the company's business has ever been made to the department. Prior to the institution of suit the corporation had written approximately 1,600 policies under the $5,000, plan and approximately 1,000 policies under the $1,000 plan. No one soliciting insurance for the corporation has ever had or has a license as an insurance agent in Texas. This suit was filed July 21, 1926.

[1] Upon the state's first contention, defendants, while not admitting the burden to prove title to the right asserted to be with defendants, contend that this burden was fully met. The individual defendants were assuming to exercise the franchises of the defendant corporation, and regardless of their showing of right under the original incorporators, the state had the right to question the exercise by them and by the corporation through them of the corporate franchise it had originally granted; and in view of our holding upon the state's second contention below, we find it unnecessary to decide the question involved in the first.

[2] The soundness of the state's second contention seems so plain to us as hardly to require more than its statement. As early as 1815, the Supreme Court of the United States said:

"A private corporation created by the Legislature may lose its franchises by a misuser or a nonuser of them; and they may be resumed by the government under a judicial judgment upon a quo warranto to ascertain and enforce the forfeiture. This is the common law of the land, and is a tacit condition annexed to the

creation of every such corporation." Terrett v. Taylor, 9 Cranch, 43, 3 L. Ed. 650.

The adjudications upon this question are multifold, and so far as concerns the general proposition they appear to be uniform. We refer only to the following cases: City Water Co. v. State (Tex. Civ. App.) 33 S. W. 259 (writ of error refused); Dock Co. v. State (Tex. Civ. App.) 173 S. W. 285; State v. Jockey Club, 200 Mo. 34, 92 S. W. 185, 98 S. W. 540; Id., 210 U. S. 325, 28 S. Ct. 732, 52 L. Ed. 1080; 14A C. J. 1104, § 3704, and authorities there cited.

In the City Water Co. Case above, Chief Justice Key, speaking for this court, said:

"The failure to elect directors or officers, or hold any meetings of directors or officers, or perform any corporate act, for nearly 8 years, and the attempted sale and surrender of all its property to another corporation, rendering itself incapable of performing its corporate duties, must be regarded as willful violations of corporate duties, and sufficient grounds to entitle the state to a forfeiture of its charter. State v. S. P. R. Co., 24 Tex. 131; 4 A. & E. Ency. Law, 304; Railway v. Morris, 67 Tex. 692, 4 S. W. 156; East Line & Railroad Co. v. State, 75 Tex. 434, 12 S. W. 690."

The rule is thus given in Corpus Juris:

"Whenever a corporation voluntarily and totally abandons the exercise of its franchises, and does or suffers to be done acts which destroy the end and objects for which it was incorporated, it is either ipso facto dissolved, or it has subjected itself to liability to be dissolved in judicial proceedings instituted for that purpose, as the case may be, under the particular statute under consideration." Volume 14A, at page 1104.

[3] There are two recognized methods of forfeiture of the corporate franchise to exist as a body politic, one de facto dissolution, and the other de jure dissolution. In this state the matter is regulated by general statute. Chapter 8 of title 32, R. S. 1925.

The first article of this chapter (1387) provides seven methods of dissolution: (1) By expiration of the time limit of its charter. (2) By judicial decree. (3) and (4) By voluntary surrender of corporate franchises. (5) By forfeiture without judicial ascertainment under any special provision of law. (6) By failure to organize within six years after filing of the charter. (7) When judicially ascertained to be insolvent. It will be observed that the first, third, fourth, fifth, and sixth methods provide for ipso facto dissolution in certain specified instances, whereas the second and seventh methods require judicial ascertainment. Mere nonuser of the corporate franchise (except failure to organize in six years) does not, under any of these methods, ipso facto work a dissolution; and for the purposes of this case we will assume that no lapse of time, however great, would in and of itself dissolve the corporation, but that there must for mere nonuser be a judicial decree forfeiting the charter rights.

In those jurisdictions recognizing generally a de facto dissolution, there would be no question but that under the facts of this case the corporation would be held to have been dissolved for nonuser of its corporate franchise, and would be conclusively presumed to have abandoned and surrendered to the state all the rights granted in its enabling act.

Independently of statutory provisions it is generally conceded, even where a de facto dissolution from nonuser is not recognized, that every legislative grant creating corporate existence is subject to the condition that the privileges and franchises conferred be used in the manner designated in the grant and in compliance with law, and that a failure therein for an unreasonable length of time, whether through neglect, design, or misfortune, is a breach of the implied agreement under which the right was granted, and authorizes the state to repossess itself of that right.

[4] While conceding this proposition generally as to those corporations which are invested with public or quasi public functions, defendants contend that the franchise granted in the present instance was merely to conduct a private business, and that neither the state nor the public generally have an interest in whether that franchise be used, or whether the business be suspended or abandoned, regardless of the length of time of such suspension or abandonment. This proposition we hold not well taken. In most of the adjudicated cases, it is true, the question arose with reference to public or quasi public corporations, but the same general principle applies to whether a corporation functions at all under its charter rights. The franchise to conduct a business, however private in its nature, under corporate existence is a valuable right and privilege. If it were conceded that no advantage could accrue to the state from the corporate existence of a concern conducting a purely private business, it would be difficult to support the theory that the grant of such right creates a contractual relation between the state and the incorporators, as there would be no consideration or motive in so far as concerns the state for granting the right. The benefits would be purely unilateral and one essential element of contract wanting. The state is, however, interested in the exercise of every franchise to be a body politic it grants; and, while different rules might be applied as between quasi public and purely private corporations regarding the manner in which they exercise their corporate functions, a total nonuse of those functions and abandonment of all vestige of corporate existence for a period sufficient to raise the presumption of voluntary surrender of the corporate

rights to the state will work a forfeiture of those rights and support dissolution. Nor can it be said that, writing life insurance is necessarily a purely private business, or one in which the state is not substantially and vitally interested. It is true, a private individual may bind himself by a contract of insurance and might in the absence of statutory regulation conduct an insurance business, but as a practical question the business cannot be conducted as an individual enterprise. It must be through some association or organization such as the voluntary mutual plan, the Lloyds system, fraternal benefit associations, or corporations chartered for that purpose. The state has for many years recognized the public interest in the business, and an elaborate system of regulatory insurance law has been adopted covering its every phase. A department of insurance has been created and many experts are employed in seeing that the various statutory requirements are complied with. The charter under which defendants are seeking to operate could not have been granted after the adoption of the Constitution of 1876. Defendants might have taken out a charter under existing general law, but for some reason they have sought to breathe life into the dead and revive a grant which for 45 years had been abandoned. Evidently, they regard the charter rights originally granted as more valuable than the rights they could acquire by incorporation under present laws. What these advantages may be does not appear, except perhaps inferentially, from the record, but, unquestionably, the state is substantially interested in whether those rights shall be now revived and exercised, and under unbroken line of decisions we can but conclude that the state has shown a conclusive right to the dissolution it seeks.

Defendants make two further counter propositions to the state's contention that the right of forfeiture exists by reason of long-continued nonuser and abandonment. First, that a forfeiture will not be granted for nonuser where at the time the right is claimed by the state the corporation has resumed and is exercising its corporate functions; and, second, that the state through its agents has recognized the existence of the corporation, permitted new capital to be contributed and used in the corporate enterprise—under which circumstances the trial court had the discretion to deny the forfeiture. Both of these propositions are overruled.

In cases where the principle announced in the first of these counter propositions has been applied, there was merely temporary suspension of business by reason of financial embarrassment or other cause, and the corporation had resumed business and replenished its depleted capital. The principle which governs the case at bar is expressed in the following language of the Supreme Court of Michigan:

"It is true the facts admitted did not operate, ipso facto, to dissolve the corporation without a judicial proceeding for that purpose; this was necessary on the part of 'the state to ascertain judicially the existence of these facts; and until the state chose to insist upon the forfeiture, no one had a right to question the existence of the corporation collaterally. The state might, through the Legislature, choose to waive the forfeiture entirely; and we are bound to presume they would do so in all proper cases. But I am not aware of any case in which it has been decided that a corporation, having been guilty of such a breach of the conditions of its existence or continuance as to authorize a forfeiture of its charter, could legally atone for such misconduct, and avoid the forfeiture by subsequent good behavior. The contrary has been several times held in the courts of New York: People v. Fishkill & B. Plank Road Co., 27 Barb. 458; People v. Hillsdale & C. Turnpike [Road] Co., 23 Wend. 254; and see Matter of Jackson Marine & Fire Ins. Co., 4 Sandf. c. 559. In the case above cited from 23 Wend. 254, was it justly said by the court that 'the argument (the same here urged by the respondents) goes to prove that a corporation may practice all manner of abuses, by commission or omission, if it be careful to stop before the Attorney General can be informed and institute a prosecution?'" People v. Bank of Pontiac, 12 Mich. 527.

[5] As to the second counter proposition, the state might estop itself from exacting forfeiture by permitting the corporation to function, new capital to be invested, and business to be conducted under claim of the corporate franchise, but there was no such estoppel in the present case. The filing of the charter amendment by the secretary of state was hardly more than a ministerial act. In order legally to do an insurance business in Texas it was necessary under our statutes to obtain a permit from the insurance commissioner. Defendant company did not wait for such permit, but began doing business immediately the amendment was filed. This statement in the agreed facts is immediately followed by the statement that the first policy issued was dated October 27, 1925, which was seven days after the company made inquiry from the insurance department as to the condition upon which it would be allowed to write insurance in Texas. The agreed statement does not show just what date the company was advised that permit would not be granted it, or whether this was before or after the demand by the insurance department, on November 1, 1925, to examine the company's books and records. However, it does appear from the agreed statement that at the time this advice was received from the insurance commissioner, the corporation had begun the writing of insurance in Texas and had made arrangements under which there was being transferred to it a large amount of life insurance. The company made no formal application for permit, and it is manifest that it did not wait to begin doing business until after it had ascer-

tained that a permit would be denied it. The efforts of the insurance department to gain access to the books and records of the corporation were resisted, and the state took no further action in regard to the corporation except the bringing of this suit, on July 21, 1926, which action under the circumstances showed, we think, reasonable promptness.

The record, in our opinion, will not support a finding either of estoppel or laches barring the state in its asserted right.

We might add in connection with the state's second contention that there is a substantial difference between the mere nonuser of some power, privilege, or franchise granted to a private corporation and a total nonuser and abandonment of every corporate function, amounting, in effect, to an abandonment of the franchise to exist as a corporatioon or body politic. It is with this latter franchise that we are dealing, and both on principle and authority the state is vitally interested in whether it be made use of at all.

The state's third contention, that under the quoted charter provision governing election of directors the right of forfeiture arose, we find unnecessary to decide. It will be observed that under this provision, if the annual meeting for election of directors should not be held in any year, the corporation should not be dissolved thereby, but an election might be had at any time within one year thereafter. The state's contention in this regard is that the language quoted, by necessary implication, dissolves the corporation if no election be had within one year after failure to hold an annual meeting. This, no doubt, would be the ordinary grammatical interpretation of the language used. There is no apparent reason for providing that the corporation should not be dissolved for failure to hold an annual meeting and granting the privilege to have an election at any time within one year thereafter, unless it were intended that failure to hold the election within the specified extended time should work a dissolution. However, the courts have been loath to declare a forfeiture merely for failure to comply with some charter requirement, in the absence of an affirmative declaration prescribing forfeiture. Without deciding the question, it may be noted the provision quoted adds strength, if strength were needed, to the state's second contention that the continued failure to elect directors as well as to perform any other corporate act for 45 years gave it the right to exact a forfeiture.

[6] We sustain the state's fourth contention that the corporation, although chartered prior to the statutes regulating insurance and creating the department of insurance, was subject to such regulations, and that it was necessary, before it could engage in the insurance business, to obtain the prescribed permit. Whether this failure would constitute ground for dissolution, we do not decide,

as it is unnecessary under our above holding that the right arose from continued nonuser.

The leading case of Chicago L. Ins. Co. v. Needles, 113 U. S. 574, 5 S. Ct. 681, 28 L. Ed. 1084, adjudicates the right of the state to regulate corporations created by special charter before the enactment of regulatory acts. We quote Associate Justice Harlan in that case:

"The main proposition of the counsel is that the obligation of the contract which the company had with the state, in its original and amended charter, will be impaired, if that company be held subject to the operation of subsequent statutes, regulating the business of life insurance and authorizing the courts, in certain contingencies, to suspend, restrain, or prohibit insurance companies incorporated in Illinois from further continuance in business. This position cannot be sustained, consistently with the power which the state has, and, upon every ground of public policy, must always have, over corporations of her own creation. Nor is it justified by any reasonable interpretation of the language of the company's charter. The right of the plaintiff in error to exist as a corporation, and its authority, in that capacity, to conduct the particular business for which it was created, were granted, subject to the condition that the privileges and franchises conferred upon it should not be abused, or so employed as to defeat the ends for which it was established, and that, when so abused or misemployed, they might be withdrawn or reclaimed by the state, in such way and by such modes of procedure as were consistent with law. Although no such condition is expressed in the company's charter, it is necessarily implied in every grant of corporate existence. Terrett v. Taylor, 9 Cranch, 43, 51; Angell & Ames on Corporations (9th Ed.) § 774, note.

"Equally implied, in our judgment, is the condition that the corporation shall be subject to such reasonable regulations, in respect to the general conduct of its affairs, as the Legislature may, from time to time, prescribe, which do not materially interfere with or obstruct the substantial enjoyment of the privileges the state has granted, and serve only to secure the ends for which the corporation was created. Sinking Fund Cases, 99 U. S. 700 [25 L. Ed. 496]; Commonwealth v. Farmers' & Mechanics' Bank, 21 Pick. [Mass.] 542 [32 Am. Dec. 290]; Commercial Bank v. Mississippi, 4 Smedes & M. 497, 503. If this condition be not necessarily implied, then the creation of corporations, with rights and franchises which do not belong to individual citizens, may become dangerous to the public welfare through the ignorance, or misconduct, or fraud of those to whose management their affairs are intrusted. It would be extraordinary if the legislative department of a government, charged with the duty of enacting such laws as may promote the health, the morals, and the prosperity of the people, might not, when unrestrained by constitutional limitations upon its authority, provide, by reasonable regulations, against the misuse of special corporate privileges which it has granted, and which could not, except by its sanction, express or implied, have been exercised at all."

[7] The only other question presented is defendants' contention that the record does

not show any right in the Attorney General to maintain the suit, predicated upon the rule announced in State v. Trust Co., 81 Tex. 530, 17 S. W. 60, that the state cannot maintain an action against a corporation for violation of a charter provision where there is no public interest to be subserved. In that case the state sought to intervene in a suit to foreclose certain bonded indebtedness of a railway company. The claim of the state was that the bonds were illegal, and that the public was interested in their being so declared, as the fixing of an illegal charge against the corporate property and franchises would affect the matter of rates. It is manifest that the question there was in no sense analogous to that presented here. As above shown, the state has a vital interest in the illegal or unauthorized use of the franchise to exercise corporate rights, and we know of no authority which holds that the right to forfeit the charter which constitutes the only authority under which the corporation may act as such is not peculiarly a matter of state interest. The state alone may institute a proceeding for that purpose, and the authority of the Attorney General would clearly exist independent of statute, but he is given the express authority by articles 4408, 6253, R. S. The former authorizes the action in this concise language:

"The Attorney General, unless otherwise expressly directed by law, whenever sufficient cause exists therefor shall seek a judicial forfeiture of the charters of private corporations."

The trial court's judgment is reversed and the cause remanded to that court, with instructions to enter judgment as prayed for by the state, canceling the corporate charter and voiding the rights, powers, and franchises granted to the Texas Mutual Life Insurance Company and Bankers' Life Insurance Company, and perpetually enjoining the individual defendants from exercising any of the powers, rights, and franchises claimed by them as successors of the original stockholders of the Texas Mutual Life Insurance Company, and appointing a receiver over the assets of said corporation, to pay its debts, liquidate it, and wind up its affairs.

Reversed and remanded, with instructions.